1

2

3

4

5

6

7

8                  **UNITED STATES DISTRICT COURT**

9                  **CENTRAL DISTRICT OF CALIFORNIA**

10

11  JOEL AGUILAR,                ) Case No. SACV 19-0539-JPR
                                 )
12                 Petitioner,   ) MEMORANDUM DECISION AND ORDER
                                 ) DENYING PETITION AND DISMISSING
13            v.                 ) ACTION WITH PREJUDICE
                                 )
14  WILLIAM SULLIVAN, Acting     )
    Warden,[1]                   )
15                               )
                   Respondent.   )
16  _____)

17                        **PROCEEDINGS**

18       On March 19, 2019, Joel Aguilar, proceeding pro se, filed a

19  Petition for Writ of Habeas Corpus by a Person in State Custody

20  and accompanying memorandum of points and authorities, raising a

21  single claim challenging his 2016 convictions for attempted

22  murder and related crimes.  Respondent filed his Answer and

23  accompanying memorandum of points and authorities on April 17,

24  _____

25       [1] Petitioner is incarcerated at the California Correctional
    Institution, see Cal. Dep't Corr. & Rehab. Inmate Locator, https://
26  inmatelocator.cdcr.ca.gov (search for "Aguilar" with "Joel") (last
    visited Jan. 16, 2020), whose acting warden is William Sullivan.
27  He is therefore substituted in as the correct respondent.  See Fed.
    R. Civ. P. 25(d); see also R. 2(a), Rs. Governing § 2254 Cases in
28  U.S. Dist. Cts.

                              1

2019, to which Petitioner has not replied.  For the reasons
discussed below, the Petition is denied and this action is
dismissed with prejudice.

**BACKGROUND**

In February 2016, Petitioner was convicted by an Orange
County Superior Court jury of premeditated attempted murder,
conspiracy to commit murder, active participation in a criminal
street gang, and possession of a firearm by a prohibited person.
(Lodged Doc. 1, 3 Rep.'s Tr. at 617-20; Lodged Doc. 2, 4 Clerk's
Tr. at 911, 913, 915-16, 961, 963.)  The jury found true various
gang and firearm enhancements.  (Lodged Doc. 1, 3 Rep.'s Tr. at
618-19; Lodged Doc. 2, 4 Clerk's Tr. at 911-14, 961.)  On March
4, 2016, the court sentenced Petitioner to a prison term of 110
years to life.  (Lodged Doc. 2, 4 Clerk's Tr. at 962.)

On June 30, 2016, the California Supreme Court decided
People v. Sanchez, 63 Cal. 4th 665 (2016), holding that
"case-specific out-of-court statements" relied on by a
prosecution gang expert are inadmissible hearsay under California
law and may also violate a defendant's Sixth Amendment right to
confrontation.  Id. at 686.  Petitioner appealed, arguing that
the trial court improperly admitted testimonial hearsay from the
prosecution's gang expert, violating Sanchez and the
Confrontation Clause (Lodged Doc. 4 at 30-45), among other
claims.  On December 27, 2017, the court of appeal rejected all
his claims in a reasoned decision on the merits and affirmed the
judgment.  (See Lodged Doc. 7); People v. Aguilar, No. G053262,
2017 WL 6602368 (Cal. Ct. App. Dec. 27, 2017).  The court found
that Petitioner's Sanchez claim failed because he had forfeited

2

it, some of the evidence was not hearsay, and any error was harmless. (Lodged Doc. 7 at 9-15); <u>Aguilar</u>, 2017 WL 6602368, at *7-8. On April 11, 2018, the state supreme court summarily denied his petition for review raising the same claims. (<u>See</u> Lodged Docs. 8, 9.) He did not petition for certiorari in the U.S. Supreme Court (Pet. at 5) or file any state habeas petitions (<u>id.</u> at 3).

## PETITIONER'S CLAIM

The admission of the gang expert's testimony at trial violated Petitioner's Sixth Amendment right of confrontation. (Pet. at 5 & Mem. P. & A. at 1.)

## SUMMARY OF THE EVIDENCE

The factual summary in a state appellate-court decision is entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1). <u>See</u> <u>Thompson v. Runnels</u>, 705 F.3d 1089, 1091-92 (9th Cir. 2013). Although Petitioner does not challenge the sufficiency of the evidence, the Court has nonetheless independently reviewed the state-court record. Based on that review, the Court finds that the following statement of facts from the California Court of Appeal decision is a fair and accurate summary of the evidence presented at trial.

On July 22, 2014, around 11:30 p.m., Maria V. parked her car on West Myrtle Street in Santa Ana to pick up one of her children from a babysitter, her boyfriend's cousin. After another vehicle passed by going in the opposite direction, she heard a "couple [gun]shots." Maria, her 10-year-old son, and the cousin, who was a nurse, approached the male victim and found he had been

3

wounded, but survived the shooting. At trial, Maria claimed she did not recognize the victim. At the preliminary hearing, she stated she had seen him around the Myrtle Street area but had never spoken with him.[FN1]

[FN1] Maria also testified at the preliminary hearing that she grew up with the defendant, [Petitioner], who was her brothers' friend. The Townsend Street gang claimed their neighborhood as its territory, and she and her four brothers belonged to the gang (hereafter "Townsend Street gang" or just "Townsend"). Her nickname was "Cookie," and she implied [Petitioner] also belonged to the gang, testifying his moniker or nickname was "Bam Bam." Maria stopped hanging out with the gang several years before the shooting. She admitted her children's father had belonged to another gang for several years, West Myrtle, a Townsend rival.

Maria called 911 to report the shooting about 40 minutes after it occurred, requesting anonymity. She told the 911 operator she saw the shooting. The assailants rode in a four-door blue Ford Explorer driven by "Little Casper," a Townsend gang member later identified as Alberto Santana. Bam Bam, who Maria referred to as "Julio" Aguilar at one point in the 911

4

call, rode in the back seat and "did the shooting." She physically described the men, noting [Petitioner] had Townsend tattoos "everywhere" including his neck and hands,[FN2] and she provided an address for Santana. She told the operator she had seen the men in a group at 805 South Townsend after the shooting.

> [FN2]    [Petitioner] did not have Townsend tattoos on his hands. Also, the tattoos on his neck referred to "Southwest," not Townsend. Maria also apparently misdescribed Santana as tall.

Detective Charles Elms and his partner interviewed Maria two days after the shooting, and the prosecution played a recording of the interview for the jury. In the interview, Maria reluctantly admitted making the 911 call, after remarking "why would [she] want to snitch" on her brothers' and "baby daddy's" neighborhoods. She told the officers she could not "say any more" because she was at "risk of a lot of things," noting her family and "everybody . . . already knows I was there." She worried her name would appear in the "paperwork," citing other witnesses who had been killed.

Nonetheless, she identified photos of Little Casper and Bam Bam, and later admitted in court that Bam Bam was [Petitioner]. She further described in the interview some details about the shooting, including that [Petitioner] used a revolver and she heard six shots. She told the officers she called 911 because she was

angry the shooting occurred in her children's presence, and the perpetrators had "no respect for families and kids." After the shooting, she went "straight over" to the 805 Townsend Street address, where a group had assembled, and yelled at [Petitioner]. [Petitioner] was not apologetic, claiming only that he did not know she was there. A "youngster" told her to "get the fuck out of [there]."

At trial, Maria claimed people she could not identify provided her with the information about the shooting, and she denied visiting Townsend Street to confront anyone. She claimed she made up the information about the shooting because she and [Petitioner] "had some issues" in the past and she despised him because he had disrespected her children by calling them each a "little fucking Turtle," a pejorative nickname Townsend used for West Myrtle. Santana also previously had disrespected her. She testified she was under the influence of marijuana and alcohol the night of the shooting. She explained her account at trial was truthful, and that she decided to tell the truth because her brother once had been convicted for something he did not do based on false testimony.

Corporal Galen Diaz responded to the shooting. Diaz found the victim, Antonio M., sitting in a chair in an apartment courtyard. He had sustained two gunshot wounds, one on his upper chest, and another on his upper left arm. Diaz knew Antonio as a West Myrtle gang

6

member, and recognized West Myrtle gang tattoos on his body. Antonio was conscious and calling out angrily for paramedics. He generally refused to provide information about the shooting or to cooperate with the officers. Officers found a bullet core or slug in the street. Diaz also identified West Myrtle gang graffiti nearby on a dumpster and on the ground. Diaz spoke on the phone with Maria shortly after the shooting, and she said she was present when the shooting occurred, identifying Bam Bam as the shooter. Diaz knew from prior field contacts that [Petitioner]'s moniker was Bam Bam.

Gang detectives accompanied by a SWAT (Special Weapons and Tactics) team arrested [Petitioner] and executed a search warrant at his residence at 805 South Townsend on August 6, 2014. They impounded a dark green 2002 Ford Explorer at an adjacent residence.

[Petitioner] made several phone calls after he was booked at the Santa Ana jail. The prosecutor played partial recordings of three calls for the jury. . . .

In [one] call, while telling ["]Jackie["], "I'm fucked," [Petitioner] asked if [she] remembered "Cookie." Jackie responded, "Aw, fucking bitch," but [Petitioner] noted "she's the only one, fool." Jackie, however, reported "that's not true, there's another also." [Petitioner] concluded by stating, "So, aw, fool, you need to respect that, be honest, fool, and tell them to get a hold of her, fool."

7

In [another] call, when Jackie advised that calls and texts to "her," the person [Petitioner] had directed her to contact, had gone unanswered, [Petitioner] directed Jackie to "go look for her." He told Jackie not to "say anything, just go look for her and kick it with her," and when he asked Jackie cryptically, "[A]nd you know what that means, right," Jackie responded, "Fuck, man, are you serious?" She exhaled, "Oh my God" when [Petitioner] affirmed, "Word, fool." [Petitioner] suggested, "Just go chill with her fool and blaze it, you know." He stated, "For reals, fool. If not I'm I'm [sic] get fucked up." He noted, "She's the only one, babe. She was the only one, babe."

Detective Elms testified as a gang expert concerning Santa Ana Hispanic criminal street gangs. He detailed his training and experience, and generally described gang practices and motivations. Familiar with the Townsend criminal street gang, he described its history, symbols, membership, the "turf" or territory the gang claimed, its primary criminal activities, and he confirmed Townsend's rivalry with the West Myrtle Street gang. Elms explained that the shooting occurred in the heart of territory West Myrtle claimed, while [Petitioner] lived nearby, less than a mile away in the center of Townsend turf.

Elms noted he personally conducted many patrols in Townsend and West Myrtle Street gang territory, and testified his familiarity with these gangs stemmed from his personal contact with gang members while in the

8

field, interviews with residents who live in the neighborhoods, and from speaking to other gang investigators. Elms drafted the search warrant that resulted in [Petitioner]'s arrest and encountered [Petitioner] at the police station after his arrest, where Elms personally observed [Petitioner]'s gang tattoos.

Elms explained the meaning of terms and tattoos unique to gang culture. For example, references to "baby" in gang parlance can mean a firearm. Elms explained that tattoos demonstrate allegiance to a gang, especially those displayed on areas of the body not covered by clothing. Elms explained that nonmembers typically do not obtain gang tattoos because doing so can be met with severe punishment; indeed, in his training and many years of experience, Elms only had heard of one nonmember doing so, and the gang retaliated by cutting out the tattoos.

Elms described how [Petitioner]'s tattoos marked him as a Townsend member in photographs displayed to the jury. [Petitioner] had the word, "Southwest," a nickname for the Townsend gang, tattooed on his neck. "Townsend" was tattooed on his chest. [Petitioner] also had on his legs tattoos of the letters "C" (Calle meaning Street) and "T" (Townsend), as well as Southwest. Similarly, Santana, the driver of the vehicle involved in the shooting, had "S" and "W" (signifying Southwest) tattooed on his shins.

Elms was not familiar with anyone in the Townsend gang named "Julio" Aguilar. Elms searched the department's internal records and did not find anybody with that name associated with Townsend. Elms knew [Petitioner] had a brother named Juan, but he was in prison at the time of the shooting. Elms acknowledged testifying at the preliminary hearing that he previously believed "Julio" was [Petitioner]'s brother and that at that time he had thought there was a "Bam Bam" (Julio) in the Townsend gang and a Little Bam Bam (defendant).

Elms opined Townsend's primary activities were narcotics sales and concealed firearm possession. He described several crimes constituting predicate acts committed by Townsend gang members. Elms conducted background research on [Petitioner] by reviewing nine Street Terrorism Enforcement and Prevention Act (STEP) notice notices [sic],[2] five field identification (FI) cards, and 14 police reports. For example, according to an April 9, 2014, STEP notice, [Petitioner] identified himself as "Bam Bam from Townsend Street," and stated he

_____

[2] A STEP notice

informs the recipient that he is associating with a known gang; that the gang engages in criminal activity; and that, if the recipient commits certain crimes with gang members, he may face increased penalties for his conduct. The issuing officer records the date and time the notice is given, along with other identifying information like descriptions and tattoos, and the identification of the recipient's associates.

Sanchez, 63 Cal. 4th at 672.

10

had been in the gang since he was 14 years old. Other STEP notices, FI cards and police reports dated between 2005 and 2014 contained similar information.

Based on this information and his interview with defendant, Elms concluded [Petitioner] was an active participant in the Townsend Street gang on the date of the shooting. Elms also opined [Petitioner] knew Townsend members engaged in a pattern of criminal activity based on a court document reflecting [Petitioner] previously admitted in court under penalty of perjury committing an act with the intent to benefit Townsend Street, which was a criminal street gang whose members he knew had engaged in a pattern of criminal activity. Elms conducted similar research on Santana and concluded he was an active participant in Townsend Street on the date of the shooting, and identified himself as Casper, or "Huero," meaning "white guy" or "white boy." Elms also reviewed STEP notices and FI cards related to the victim Antonio, who had consistently admitted membership in West Myrtle. Elms agreed West Myrtle had other rivals.

Based on hypothetical questions reflecting the facts of the case, Elms noted the tactical advantage of the shooter riding in the rear seat because the shooter would not have "to shoot in front of the driver." He opined the crime was committed "for the benefit of, at the direction of, or in association with the street gang that the people in that car were from," noting it "would

benefit their reputation, it would benefit their status
. . . ." He explained that "gang members are expected to
put in work, they're expected to commit crimes," and "two
gang members were together [associating when they]
entered the rival gang member territory to commit a
crime." Elms opined the hypothetical crime was committed
to assist and promote the gang, and benefitted and
promoted criminal conduct by members of the gang. The
violent crime elevated the assailants' status within the
gang, and promoted the gang as a whole.

. . .

Elms and his partner spoke with [Petitioner] at the
station on the day of his arrest after advising him of
his rights . . . . The prosecutor played a recording of
the interview at trial. [Petitioner] initially denied
ever riding in a car with Santana or entering Myrtle
Street territory. He later admitted he might "sometimes"
take a shortcut through that area to get to work at the
swap meet. He then admitted "hang[ing] out" with
Santana, and riding in Santana's sister's Explorer. But
he denied riding in the Explorer with Santana, but then
admitted doing so with Santana and Santana's "girl" on
occasion. He acknowledged he might have passed through
the Myrtle area, but not on Myrtle Street, earlier on the
evening of the shooting, around 6:00 or 7:00 p.m.

(Lodged Doc. 7 at 2-9); Aguilar, 2017 WL 6602368, at *1–4 (some
alterations in original).

12

Under 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim — (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under AEDPA, the "clearly established Federal law" that controls federal habeas review consists of holdings of Supreme Court cases "as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000). As the Supreme Court has "repeatedly emphasized, . . . circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'" Glebe v. Frost, 574 U.S. 21, 24 (2014) (per curiam) (quoting § 2254(d)(1)).

Although a particular state-court decision may be both "contrary to" and "an unreasonable application of" controlling Supreme Court law, the two phrases have distinct meanings. Williams, 529 U.S. at 391, 412-13. A state-court decision is "contrary to" clearly established federal law if it either

13

applies a rule that contradicts governing Supreme Court law or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002) (per curiam) (citation omitted). A state court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." <u>Id.</u>

State-court decisions that are not "contrary to" Supreme Court law may be set aside on federal habeas review only "if they are not merely erroneous, but 'an <u>unreasonable</u> application' of clearly established federal law, or based on 'an <u>unreasonable</u> determination of the facts' (emphasis added)." <u>Id.</u> at 11 (quoting § 2254(d)). A state-court decision that correctly identifies the governing legal rule may be rejected if it unreasonably applies the rule to the facts of a particular case. <u>Williams</u>, 529 U.S. at 407-08. To obtain federal habeas relief for such an "unreasonable application," however, a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable." <u>Id.</u> at 409. In other words, habeas relief is warranted only if the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Harrington v. Richter</u>, 562 U.S. 86, 103 (2011).

Here, Petitioner raised his claim on direct appeal, and the court rejected it on the merits in a reasoned decision. Given the silent denial by the state supreme court, that decision is the last reasoned one from any state court and the Court

14

therefore relies on it as the basis for the state court's judgment. See <u>Wilson v. Sellers</u>, 138 S. Ct. 1188, 1192 (2018) (rebuttable presumption exists that higher state court's unexplained decision "adopted the same reasoning" as last reasoned state-court decision); <u>see also</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991) (applying presumption that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground"). AEDPA deference limits the Court's review of a claim rejected on the merits, <u>see</u> <u>Richter</u>, 562 U.S. at 100, as well as on the merits in the alternative, <u>see</u> <u>Clabourne v. Ryan</u>, 745 F.3d 362, 383 (9th Cir. 2014), <u>overruled on other grounds by</u> <u>McKinney v. Ryan</u>, 813 F.3d 798, 802 (9th Cir. 2015) (en banc).

## DISCUSSION

Relying on <u>Sanchez</u>, Petitioner claims his Sixth Amendment right to confront witnesses was violated when the trial court permitted the prosecution's gang expert to relay to the jury hearsay he considered in concluding that Petitioner was the individual identified by the eyewitness and was a Townsend gang member.[3] (<u>See</u> Pet. at 3; <u>id.</u>, Mem. P. & A. at 9.) Respondent argues that Petitioner's failure to object to the expert's testimony bars federal habeas relief. (Answer at 2, ¶ V; <u>id.</u>, Mem. P. & A. at 8.) Because it is easier to dispose of the claim

---

[3] To the extent Petitioner claims that that testimony was inadmissible hearsay under state law (<u>see, e.g.</u>, Pet., Mem. P. & A. at 3), the claim is not cognizable on federal habeas review. <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991) (federal habeas relief unavailable for violations of state law).

on the merits, the Court resolves it solely on that basis.  <u>See</u>
<u>Lambrix v. Singletary</u>, 520 U.S. 518, 524-25 (1997); <u>Franklin v.</u>
<u>Johnson</u>, 290 F.3d 1223, 1232 (9th Cir. 2002).

**Some of the Objected-to Evidence Was Not Testimonial Hearsay, and**
**Any Violation of the Confrontation Clause Was Harmless**

Even assuming Petitioner's claim is not procedurally barred,
it fails.

A.    <u>Applicable Law</u>

The Confrontation Clause of the Sixth Amendment affords a
criminal defendant the right to cross-examine witnesses against
him.  <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 678 (1986).  In
<u>Crawford v. Washington</u>, 541 U.S. 36, 53-54 (2004), the Supreme
Court held that the clause bars "admission of testimonial
statements of a witness who did not appear at trial unless he was
unavailable to testify, and the defendant had had a prior
opportunity for cross-examination."  Conversely, the
Confrontation Clause does not bar nontestimonial statements.  <u>Id.</u>
at 68; <u>see</u> <u>Davis v. Washington</u>, 547 U.S. 813, 821 (2006) ("It is
the testimonial character of the statement that separates it from
other hearsay that, while subject to traditional limitations upon
hearsay evidence, is not subject to the Confrontation Clause.").

<u>Crawford</u> did not spell out a comprehensive list of
"testimonial" statements but noted that they include (1) "ex
parte in-court testimony or its functional equivalent," such as
affidavits, custodial examinations, prior testimony made without
cross-examination, and "similar pretrial statements that
declarants would reasonably expect to be used prosecutorially";
(2) extrajudicial statements contained in formalized testimonial

16

materials; and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." 541 U.S. at 51-52 (citations omitted).

In 2016, the California Supreme Court held that "case-specific out-of-court statements" relied on by a prosecution's gang expert, particularly when testifying about a defendant's association with or membership in a gang, may constitute testimonial hearsay and violate the Confrontation Clause when the expert presents them as true statements of fact without independent proof by competent evidence. See Sanchez, 63 Cal. 4th at 686, 694-98. Courts have interpreted Sanchez to bar expert-witness hearsay testimony only if it relates "to the particular events and participants alleged to have been involved in the case being tried." People v. Vega-Robles, 9 Cal. App. 5th 382, 411 (2017) (no Sanchez error in admitting gang-expert testimony about gang's history and founding as well as activities of other members not alleged to have participated in charged crime); see also Hernandez v. Robertson, No. CV 18-08513-JGB (AS), 2019 WL 4364948, at *7-8 (C.D. Cal. July 19, 2019) (finding that state court reasonably concluded that gang expert's testimony about gang's pattern of criminal activity based on officers' statements and field-interview cards about other gang members was not case-specific under Sanchez), accepted by 2019 WL 4344275 (C.D. Cal. Sept. 11, 2019).

B.  Court-of-Appeal Decision

The court of appeal found that some of the testimony Petitioner challenges did not

> fall under <u>Sanchez</u>'s proscription against experts
> conveying hearsay evidence to the jury under the guise of
> rendering an expert opinion. Instead, the material was
> at most "routine" hearsay untethered to any expert
> opinion.

(Lodged Doc. 7 at 10); <u>Aguilar</u>, 2017 WL 6602368, at *5. In particular,

> Elms's testimony that he could not locate a "Julio"
> Aguilar in any department records and that another search
> showed [Petitioner]'s brother Juan was in prison at the
> time of the shooting, and therefore could not have
> committed the crime . . . f[e]ll outside <u>Sanchez</u>'s scope
> because Elms did not rely on the result of these searches
> as basis evidence for his conclusion [Petitioner] was a
> gang member or <u>any other opinion</u>. Instead, he simply
> disclosed the results of record searches he personally
> performed.

(Lodged Doc. 7 at 13-14 (emphasis in original)); <u>Aguilar</u>, 2017 WL 6602368, at *7.

Noting that the state had "concede[d] that to the extent Elms relayed to the jury the contents of police reports outside his personal knowledge, and the reports reflected the investigation of completed crimes, statements made in those reports constituted testimonial hearsay," the court of appeal held that "any error [was] harmless" because Petitioner's "conduct and admissions in properly admitted testimony marked him as a member of the Townsend Street gang." (Lodged Doc. 7 at 14); <u>Aguilar</u>, 2017 WL 6602368, at *7. It reasoned that

18

[m]uch of Elms's testimony was based on personal knowledge because he had conducted "heavy" patrols in Townsend Street and West Myrtle Street gang territory and personally interviewed [Petitioner] during the investigation. . . . During that interview, [Petitioner] made statements about his gang affiliation and Elms personally observed [Petitioner]'s Townsend tattoos. Independently admitted photograph evidence of [Petitioner]'s tattoos also supports the gang expert's testimony.

. . .

Other properly admitted evidence duplicated [Petitioner]'s admissions in the various STEP notices and FI cards that he was a Townsend gang member. Maria V.'s 911 call, interview with police, and testimony at trial all disclosed that [Petitioner] belonged to the gang and went by the moniker Bam Bam. The jury could infer from [Petitioner]'s presence at the meeting among several Townsend members after the shooting that [he] was currently active in the gang. Additionally, another officer who testified, Officer Diaz, stated he knew [Petitioner] was Bam Bam from the Townsend Street gang based on his previous contacts with [Petitioner] in the field. Moreover, defense counsel admitted [Petitioner] was a gang member during closing argument, conceding the issue.

The same is true regarding [Petitioner's codefendant] Santana. Other properly admitted evidence

19

duplicated information concerning his gang ties in the
STEP notices, FI cards, and police reports.  As with
[Petitioner], Elms personally observed Santana's gang
tattoos at the police station and the trial court
properly admitted photographs of the tattoos.  Maria V.'s
911 call and interview also established evidence Santana
[w]as a member of the Townsend Street gang with the
moniker Little Casper.  For all the foregoing reasons,
[Petitioner]'s hearsay and confrontation challenges under
<u>Sanchez</u> therefore fail.

(Lodged Doc. 7 at 14-15); <u>Aguilar</u>, 2017 WL 6602368, at *7-8.

C.   <u>Analysis</u>

As an initial matter, to the extent Petitioner's
Confrontation Clause claim rests on <u>Sanchez</u>, it is not cognizable
on federal habeas review because the U.S. Supreme Court has not
"clearly established that the admission of out-of-court
statements relied on by an expert violates the Confrontation
Clause." <u>Hill v. Virga</u>, 588 F. App'x 723, 724 (9th Cir. 2014).
"Where the Supreme Court has not addressed an issue in its
holding, a state court adjudication of the issue . . . cannot be
contrary to, or an unreasonable application of, clearly
established federal law." <u>Stenson v. Lambert</u>, 504 F.3d 873, 881
(9th Cir. 2007) (citation omitted); see <u>Wright v. Van Patten</u>, 552
U.S. 120, 126 (2008) (per curiam) (barring § 2254(d)(1) relief
"[b]ecause our cases give no clear answer to the question
presented, . . . [so] 'it cannot be said that the state court
unreasonabl[y] appli[ed] clearly established Federal law.'"
(citation omitted; some alterations in original)).  Thus,

Petitioner's <u>Sanchez</u> claim fails.  <u>See, e.g.</u>, <u>Peters v. Arnold</u>, 765 F. App'x 389, 390 (9th Cir.) (holding that <u>Sanchez</u> "does not count as clearly established federal law"), <u>cert. denied</u>, No. 19-6057, 2019 WL 5686694 (U.S. Nov. 4, 2019).

At any rate, Petitioner has not shown that all of the challenged evidence was testimonial hearsay or that even if some of it was, any violation of the Confrontation Clause was not harmless.  Petitioner challenges Elms's reliance on "information contained in internal police reports" to conclude that he was the assailant identified by the eyewitness, including reports "showing there was no member of the Townsend Gang named Julio Aguilar" — the name the eyewitness originally gave police — and that "[P]etitioner's brother Juan Aguilar could not have committed the shooting[] because he was in prison."  (Pet., Mem. P. & A. at 9.)  As the appeal court noted, however, Elms's trial testimony "simply disclosed the results of record searches he personally performed."  (Lodged Doc. 7 at 14); <u>Aguilar</u>, 2017 WL 6602368, at *7.  Indeed, a witness may testify to the presence or absence of something in agency records he searched without implicating the Confrontation Clause.  <u>See</u> <u>United States v. Norwood</u>, 603 F.3d 1063, 1068 (9th Cir. 2010).  Thus, Elms's testimony about the absence of "Julio Aguilar" in department records was likely proper.  Moreover, the administrative records indicating that Petitioner's brother Juan was in prison at the time of the shooting likewise were probably not testimonial.  <u>See</u> <u>Melendez-Diaz v. Massachusetts</u>, 557 U.S. 305, 324 (2009) (records "created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial

21

1  . . . are not testimonial").[4]

2      But even as to the field-identification cards and police
3  reports that likely contained testimonial hearsay (see Lodged
4  Doc. 5 at 22 (Respondent conceding point on appeal)), any error
5  was harmless, as the court of appeal found. (See Lodged Doc. 7
6  at 14-15); Aquilar, 2017 WL 6602368, at *7; Brecht v. Abrahamson,
7  507 U.S. 619, 623 (1993) (constitutional error does not warrant
8  habeas relief unless it had substantial and injurious effect or
9  influence in determining jury's verdict). Petitioner's gang
10 affiliation and moniker were established by compelling
11 independent evidence. Elms testified that he personally
12 interviewed Petitioner (see Lodged Doc. 1, 2 Rep.'s Tr. at 348-
13 50; see id. at 349 (audio recording of that interview played for
14 jury)), who admitted he was Bam Bam (see Lodged Doc. 2, 2 Clerk's
15 Tr. at 330), and he observed Petitioner's gang tattoos after his
16 arrest (see Lodged Doc. 1, 2 Rep.'s Tr. at 340-42). Photographs
17 of those tattoos were shown to the jury. (Id.) In her properly

18

19 _____

20      [4] Petitioner also challenges the trial court's admission of
   Elms's testimony that Petitioner knew that Townsend gang members
21 had engaged in a pattern of criminal activity. (Pet., Mem. P. & A.
   at 10; see Lodged Doc. 1, 2 Rep.'s Tr. at 377-79.) Although that
22 testimony may have violated state law against a gang expert's
   offering his opinion on a defendant's mental state (see Lodged Doc.
23 5 at 29 (state conceding that Elms's testimony violated People v.
   Killebrew, 103 Cal. App. 4th 644, 658 (2002))), it poses no
24 Confrontation Clause issue. To the contrary, Elms based his
   opinion on Petitioner's apparent admission in a previous court
25 proceeding, under penalty of perjury, that he knew Townsend gang
   members had engaged in a pattern of criminal activity. (See Lodged
26 Doc. 1, 2 Rep.'s Tr. at 379.) That is not testimonial hearsay.
27 See Vasquez v. Kirkland, 572 F.3d 1029, 1037 (9th Cir. 2009)
   (recognizing that "cases involv[ing] the use of a defendant's own
28 statements against him" do not implicate Sixth Amendment).

admitted 911 call, the eyewitness, a former Townsend gang member, identified "Bam Bam" as the shooter and as someone she knew who was "gang related from Townsend" (Lodged Doc. 1, 1 Rep.'s Tr. at 131-32; Lodged Doc. 2, 3 Clerk's Tr. at 645), and at trial she again identified Petitioner as Bam Bam and conceded that she had told Elms that she saw Bam Bam in the back seat of the Ford Explorer after the shooting (Lodged Doc. 1, 1 Rep.'s Tr. at 122-23, 129).  Officer Diaz testified that he knew Petitioner from prior field contacts and that his street moniker was "Bam Bam." (Id., 2 Rep.'s Tr. at 251.)

Moreover, sufficient evidence demonstrated that Petitioner's codefendant, the driver during the shooting, was an active Townsend gang member and that the victim was from a rival gang. (See id. at 261-62 (Diaz testifying that he recognized victim as West Myrtle gang member he knew from more than dozen prior contacts), 35 (gang expert identifying Santana's "South" and "West" tattoos and testifying that they indicated he was member of Townsend gang); Lodged Doc. 2, 3 Clerk's Tr. at 645 (eyewitness identifying driver during 911 call as "Little Casper" and his passenger, the shooter, as someone she knew to be "gang related from Townsend"), 659 (eyewitness confirming during police interview that Santana was Little Casper).)

Thus, any portions of Elms's testimony admitted in error would not have affected the jury's verdict.  See Legaspi v. Barnes, No. 1:15-cv-00844 DAD MJS (HC), 2017 WL 25376, at *17 (E.D. Cal. Jan. 3, 2017) (finding any Sanchez error harmless when sufficient admissible evidence showed "Petitioner's gang affiliation"); Morrison v. Montgomery, No. EDCV 16-00775-JFW

(KES), 2016 WL 8470182, at *11–12 (C.D. Cal. Dec. 29, 2016) (gang expert's testimony as to "cumulative information . . . that Petitioner was a member of [a gang]" did not affect jury's verdict when "the [admissible] evidence that Petitioner was a gang member was strong"), accepted by 2017 WL 981387 (C.D. Cal. Mar. 13, 2017).

Accordingly, habeas relief is not warranted.

**ORDER**

IT THEREFORE IS ORDERED that Judgment be entered denying the Petition and dismissing this action with prejudice.

DATED: January 17, 2020

JEAN ROSENBLUTH
U.S. MAGISTRATE JUDGE